MULTIPLAN, INC. and PRIVATE ) UNITED STATES DISTRICT COURT
HEALTHCARE SYSTEMS, INC.      SOUTHERN DISTRICT OF MISSISSIPPI
**Plaintiffs**

                                                   )

v.                                              ) **CIVIL ACTION NO.:1:14cv315LG-RHW**

STEVEN W. HOLLAND D/B/A PHYSICAL
THERAPY CLINIC OF GULFPORT and KEVIN
BARRETT D/B/A QUEST FINANCIAL RECOVERY
SERVICES
**Defendants**



SOUTHERN DISTRICT OF MISSISSIPPI
**FILED**
SEP 29 2014
ARTHUR JOHNSTON
BY_____ DEPUTY

## ANSWER TO COMPLAINT AND COUNTERCLAIM

**Comes now**, the Defendant, Steven W. Holland d/b/a Physical Therapy Clinic of Gulfport, and files this his answer to Plaintiffs Verified Complaint for Declaratory Judgment, Injunctive Relief and Other Relief, and would show unto the Court as follows:

1. Defendant admits the allegations in Paragraph No.: 1.

2. Defendant admits the allegations in Paragraph No. 2.

3. Defendant admits the allegations in Paragraph 3.

4. Defendant admits the allegations in Paragraph No. 4.

5. Defendant denies the allegations in Paragraph No. 5. The Plaintiffs violated section 6.1 of the PHCS contract in which both sides are to meet and seek resolution in good faith, we attempted to dispute, and even use an administrative non judicial method for resolution, and as a result were sued in direct violation of the PHCS contract. **(See PHCS contract attached as Exhibit A)**

6. Defendant admits the allegations in Paragraph No.: 6 based on the fact that MPI chose to breach section 6.1 of the PHCS contract, and chose legal action in a court of law. **(See PHCS contract attached as Exhibit A)**

7. Defendant admits the allegations in Paragraph 7.

8. Defendant denies the allegations in Paragraph No.: 8

1

9. Defendant admits the allegations in Paragraph No.: 9.

10. Defendant admits the allegations of Paragraph No.:10.

11. Defendant admits the allegations of Paragraph No. 11.

12. Defendant admits the allegations of Paragraph No. 12.

13. Defendant admits the allegations of Paragraph No.: 13.

14. Defendant admits the allegations of Paragraph No.: 14.

15. Defendant admits the allegations of Paragraph No.: 15, however, Defendant terminated the contract based on breach of contract by MPI, which according to section 2.4 of the PHCS contract, and in accordance with, was terminated in 30 days verses 90 as called for in any other termination situation.

16. Defendant admits the allegations of Paragraph No.: 16.

17. Defendant admits the allegations of Paragraph No.: 17.

18. Defendant admits the allegations of Paragraph No.: 18. Please note that the actual date of the letter was June 26, 2007

19. Defendant denies the allegations of Paragraph No.: 19. Counsel for the Plaintiffs stated that the 2007 notice explained that Plaintiff, MultiPlan's acquisition of PHCS resulted in my Agreement being amended to: (a) add a network product which is a false statement. In contrast, the notice states that the letter does not affect any participation relationship I may have with PHCS through group or facility contracts. **(See 2007 Plaintiff, MultiPlan's letter attached as Exhibit B)**

20. Defendant denies the allegations of Paragraph No.: 20. The Plaintiffs re-pricing of Physical Therapy Clinic of Gulfport's workers' compensation claims is not pursuant to any contract with a Health Plan Payer as per terms of the PHCS Agreement. In this matter, the Plaintiff, MultiPlan, contracted with Coventry Health Care, who may practice as a health plan, but also provides cost-containment services to health plan payers, e.g. repricing/discounting of claims by applying PPO contractual rates to claims not entitled to PPO contractual discounts, in which was the case in this matter. Coventry is not a Health Plan Payer in this matter **(See section 1.5 of PHCS contract attached as Exhibit A,)** and  instead, acted as a claim repricing firm only, and did not meet any of

2

the requirements of a Health Plan Payer as per terms of the PHCS Agreement, e.g. provide patient steerage (**See section 1.1 of PHCS contract attached as Exhibit A,)** and patient-member ID ( **See section 4.4 of PHCS contract attached as Exhibit A, as well as Plaintiffs Exhibit B.)**

 As confirmed in Kelley M. Basel's affidavit, **(See Plaintiffs Exhibit 3)** Plaintiff, MultiPlan also contracts with bill review companies, and Coventry is one of those bill review companies who is an aggregator that contracts with Plaintiff, MultiPlan to provide discounts. They are not a health plan in this matter as the Plaintiff, and their counsel, would lead the court to believe by purposely leaving out the fact that Plaintiff, MultiPlan also contracts with bill review (repricing) companies e.g. Coventry.

21. Defendant denies the allegations of Paragraph No.: 21. Counsel for the Plaintiff states that the changes were authorized by the PHCS contract is a false statement. It is true that the Agreement allows PHCS to, at its sole discretion, designate individual products in which Defendant agreed to participate. Section 3.7 of the PHCS contract **(See attached PHCS contract attached as Exhibit A)** stipulates any designated product must be within the PHCS network.

22. Defendant admits the allegations of Paragraph No.: 22.

23. Defendant denies the allegations of Paragraph No.: 23. Plaintiffs are attempting to compel the court to believe that Section 3.7 of the Agreement allows for amending Defendant's PHCS contract, however, no amendments to the contract can be performed without mutual consent in writing signed by participating provider, as well as PHCS **(See section 9.2 of the PHCS contract attached as Exhibit A)** Section 3.7 only allows the designation of the products in which Defendant have agreed to, and also only allows modification of the administrative handbook. It does not allow any amending of the contract Agreement itself. Furthermore, the 2007 notice **(See attached 2007 Plaintiff, MultiPlan's letter attached as Exhibit B)** did not give notice me that the Agreement had been amended, and thus, this statement is false.

24. Defendant admits to the allegations of Paragraph No.: 24.

25. Defendant admits to receipt of the letter, but I deny the fact that I ever agreed to participate in the workers compensation network.

26. Defendant admits to the allegations of Paragraph No.: 26.

27. Defendant admits to the allegations of Paragraph No.: 27. Only the rate changes were authorized by the agreement based upon (60) days prior written notice to Defendant, as provided for in section 7.4 of the PHCS contract **(See PHCS contract attached as Exhibit A,)** which only refers to modification of preferred payment rates and terms. Section 7.4 does not address any amending of the contract to include adding a different product, or another network by notification in writing, and a (60) day time period to accept or deny.

28. Defendant admits only to rate modifications, and denies the remaining allegations. No amendments could be made to the PHCS contract without mutual agreement in writing **(See 9.2 of the PHCS contract attached as Exhibit A.)** Section 7.4 of PHCS contract attached as Exhibit A does allow for rate modification with sixty (60) day notice. Plaintiffs allegations were that amendments to the networks products could be could added with the same sixty (60) day notice, which is not authorized by 7.4 of the PHCS contract attached as Exhibit A.

29. Defendant denies the allegations of Paragraph No.: 29. The June 26th of 2007 notice only applied to reimbursement rate changes as provided in section 7.4 of the agreement **(See attached PHCS contract attached as Exhibit A.)** The April 25th of 2011 notice was the first to ever mention workers compensation network, and showed it as a separate network outside of the PHCS network. This notice was based on the June 26th of 2007 **(See Plaintiff, Multiplan's 2007 letter attached as Exhibit B)** notice that Plaintiffs state as fact amended my PHCS contract to include workers compensation, however, once again, the actual letter does not have any mention of any amendment to include workers compensation, nor was there a workers compensation product line under the Plaintiff, MultiPlan umbrella until four years later. **(See Integrated Health Care Group press release attached as Exhibit C.)** There are also two (2) other notices sent to Defendant's practice in between that June 26th of 2011 notice, and the April 25th of 2011 notice, and neither mention workers compensation network involvement, as there was no workers compensation product in place. Therefore, this statement is false, and once again goes to fraud and defense of the wrongful discounts after the fact. **(See attached Plaintiff, MultiPlan's letter dated May 4, 2010 as Exhibit D, and Plaintiff, MultiPlan's letter dated January 10, 2011 as exhibit E.)**

30. Defendant admits only to the agreement authorizing PHCS to modify or expand the network of payers, and designate within that network the products for which Defendant participates in. The Plaintiff, MultiPlan workers compensation specialty network **(See copy of Plaintiff, MultiPlan's listing of networks from their administrative handbook attached as Exhibit F)** is a separate network, and also workers

4

compensation as a network product would be in violation of sections 1.1, 1.3, 1.5, 4.4, 4.5 of the PHCS that is attached herein as Exhibit A.

31. Defendant denies the allegations in Paragraph No.: 31. Plaintiff states that the discounts taken were consistent with the agreement without complaint, or objection, by myself, however the majority of the Plaintiffs evidence placed into court record shows a continued effort to dispute the discounts, site laws violated by taking said discounts, and denoting that the PHCS contract does not allow for adding a workers compensation product, as it is a state mandated program that can't abide with the covenants of the PHCS contract. **(See section 1.1, 1.3, 1.5, 4.4, 4.5 of the PHCS contract attached as Exhibit A.)** Workers compensation cannot fulfill the consideration requirements in return for taking discounts, and is fully paid by the employers plan with a workers compensation insurance company, therefore there can be no financial steerage, no ID cards given to patients, no co pays, deductibles and co insurance to be addressed as provided in the above sections of the PHCS contract. Furthermore, the notice in the June 26th of 2007 did not even address the amendment to include workers compensation as stated as fact by the Plaintiffs counsel in this action, as there was not a workers compensation product from Plaintiff, MultiPlan at that time. **(See Integrated Healthcare Group Press Release attached as Exhibit C)**

32. Defendant denies the allegations of Paragraph No.: 32. The Plaintiff admits that the Agreement did not expressly address the discounts applying to workers' compensation products. However, the Mississippi Workers' Compensation Law requires an expressed agreement from the provider **(See Rules and Regulations Mississippi Workers Compensation Commission regarding billing and reimbursement rules of medical claims attached as Exhibit G.)** The Plaintiffs counsel is correct in their pleading when stating that the agreement did not expressly address Defendant's discounts applying to workers compensation products. In fact, it could not be included based on sections 1.1, 1.3, 1.5, 4.4, 4.5 and 9.2 of the PHCS agreement. **(See PHCS agreement attached as Exhibit A.)** The workers compensation discounts that were re-priced by the parties involved, then disputed by Defendants, and resulted in this legal action, were prohibited by the Rules and Regulations Mississippi Compensation Commission **(See attached as Exhibit G)** which would violate sections 4.1, 9.1, and 9.3 of the PHCS agreement. **(See attached Exhibit A.)**

33. Defendant denies the allegations of Paragraph No.: 33. According to the PHCS contract payor is defined as (1.5) an insurance company, employer health plan, Taft-Hartley Fund, or other organization liable to pay or agree to pay for the provision of health care services to covered individuals through the PHCS provider network. Section (1.3) defines a covered individual as any individual or dependent covered by a contract.

Section (1.1) defines contract as any insurance policy, benefit plan or other health plan or program that includes direction (as defined in section 4.5) to preferred providers. Section (4.5) defines direction and states that PHCS will require each payor to make available and promote contracts which provide direction to preferred providers. Direction may occur through (i) greater plan benefits, (ii) access to lists or directories of preferred providers in printed form or by phone or website, or (iii) the provision of financial incentives that provide covered individuals with savings when they obtain health care services from preferred providers. State mandated workers compensation is insurance purchased by the employer and provided to an employee only in the time of an injury, therefore there can be no individual contract for each patient as called for in section (1.3). Coventry Workers Compensation and Mitchell Inc are neither payors as defined in section (1.5) as both just purchased the discounts and sold or used them for profit in line with their contracts with their clients. Neither Coventry or Mitchell Inc, or any down line clients of theirs, (Sentry, EMC, Strategic Comp) could have, or actually did, perform the condition of direction of the patients (4.5). Both were simply aggregate clients in the case of Coventry **(per admission of Kelly Basel in her affidavit submitted by the Plaintiffs as Exhibit 3)** or a bill review and re-pricing company with Mitchell Inc, who applied the discounts to their clients EMC, Sentry and Strategic Comp. The State of Mississippi patient care is directed by the treating physician as defined in Mississippi Workers Compensation rules and regulations **(See attached Article 10 Rules and Regulations Mississippi Workers Compensation Commission as Exhibit H.)** In the June 26th of 2007 letter, it did not even address the amendment to include workers compensation as stated as fact by the Plaintiff, as there was not a workers compensation product from Plaintiff, MultiPlan at that time. **(See Plaintiff, MultiPlan's letter dated June 26, 2007 attached as Exhibit B.)**

34. Defendant admits to certain allegations of paragraph No: 34, only to receipt of the April 25th of 2011 letter where Plaintiff, MultiPlan's workers compensation network was first mentioned. The Defendants denies the remaining allegations.

35. Defendant denies the allegations of Paragraph No.: 35. The Plaintiffs state that in return for granting the discounts to Plaintiff, MultiPlan's clients, Defendant received the benefit of increased patient volume and other benefits, which is a false statement. In contrast, I did not receive any patient volume in return for the discounts taken, not legal or agreed to. The discounts were taken after services were rendered, and therefore, the patients were not steered to me. Furthermore, the purported workers' compensation agreement discounted amount was for 15% off the state's set fee schedule as per Plaintiff, Plaintiff, MultiPlan's notice to me **(See Plaintiffs Exhibit B ).** However, Plaintiff, MultiPlan provided discounts in the amount of 42% off the state's set fee schedule **(Explanations of Benefits attached as Exhibit I.)** Workers compensation is a state

6

mandated program purchased by the employers, and does not meet any of the following sections of the contract  (1.1), (1.3), (1.5), (4.2), (4.4), (4.5), (7.3), (7.5.) **(See PHCS contract attached as exhibit A)** Therefore, the fraudulent enrollment, and absorbent discounts taken against my medical claims caused severe financial harm.

Sections (9.1) and (9.3) of the contract state the agreement must be construed to govern to the laws, rules and regulations of the state in which the health care services are performed. Mississippi workers compensation rules and regulations prohibit re-pricing of claims without mutual agreement, and state furthermore that any separate fee contract shall automatically contain all rules and regulations which include no re-pricing without mutual agreement. (9.1) goes on to say any provision herein inconsistent therewith will be of no effect and will be severable. So even if any section of the PHCS contract would legally allow workers compensation to be amended to the contract, it could not be governed by the contract, could not fulfill the considerations in the contract, and in the area of re-pricing claims after the fact and post treatment as in this case, would be illegal by MS law, and would be considered severable by the contract. **(See Rules and Regulations Mississippi Workers Compensation Commission regarding billing and reimbursement rules of medical claims attached as Exhibit G.)**

36. Defendant admits certain allegations of paragraph No: 36, agrees only to becoming dissatisfied with wrongful discounts, but denies that the PHCS contract legally allowed amending to allow for workers compensation to be added.

37. Defendant admits the allegations of Paragraph No.: 37.

38. Defendant admits the allegations of Paragraph No.: 38.

39. Defendant denies the allegations of Paragraph No. 39.

40. The Defendant admits the allegations of Paragraph No.: 40.

41. The Defendant admits the allegations of Paragraph No.: 41.

42. The Defendant admits the allegations of Paragraph No.: 42.

43. The Defendant admits the allegations of Paragraph No.: 43.

44. The Defendant is without proper knowledge to admit or deny the allegations of Paragraph No.: 44.

45. The Defendant admits to certain allegations of Paragraph No.: 45 to the fact of notice of fault being sent, but denies it was harassment, as it was a form of administrative and non judicial process to seek resolution after disputes were continued to be deemed legal, and valid, even though proof against such was brought forward.

46. Defendant admits the allegations of Paragraph No.: 46.

47. Defendant admits the allegations of Paragraph No.: 47.

48. Defendant admits the allegations of Paragraph No.: 48.

49. Defendant admits certain allegations of paragraph No: 49, the response was received by Quest Recovery, but Defendant denies sending the affidavit.

50. Defendant admits certain allegations of paragraph No: 50,that notice was sent, but denies that it was sent by Defendant, Steven W. Holland. Defendant further denies to harassment, as it was a form of administrative and non judicial process to seek resolution after disputes were continued to be deemed legal, and valid, even though proof against such was brought forward.

51. Defendant admits the allegations of Paragraph No.: 51.

52. Defendant admits the allegations of Paragraph No.: 52.

53. Defendant admits certain allegations of paragraph No: 53, notices were sent by Kevin Barrett d/b/a Quest Financial Recovery, but denies a barrage of nonsensical letters containing broad and pernicious threats. The notices were the same affidavit process sent to MPI, and it was a form of administrative and non judicial process to seek resolution after disputes were continued to be deemed legal, and valid, even though proof against such was brought forward.

54. Defendant admits the allegations of Paragraph No.: 54.

55. Defendant admits certain allegations to paragraph No: 55, to reiteration, but denies as to anything being lawful and valid per agreement as evidenced in answers above.

56. Defendant admits to the allegations of Paragraph No.: 56.

57. Defendant admits to the allegations of Paragraph No.: 57.

8

58. Defendant admits to the allegations of Paragraph No.: 58.

59. Defendant admits to certain allegations of paragraph No: 59, Quest not being a law firm, but denies that Quest sent threatening letters. Defendant further denies that Quest financial Recovery has received any funds from this action as of date.

60. Defendant admits to certain allegations of paragraph No: 60, notice, but denies harassment.

61. Defendant admits to the allegations of Paragraph No.: 61.

62. Defendant admits to the allegations of Paragraph No.: 62.

63. Defendant denies the allegations of Paragraph No.: 63.

64.  Defendant admits the allegations of Paragraph No.: 64.

65. Defendant admits the allegations of Paragraph No.: 65.

66. Defendant admits the allegations of Paragraph No.: 66.

67. Defendant admits the allegations of Paragraph No.: 67.

68. Defendant is without knowledge to admit or deny to the allegations of Paragraph No.: 68.

69. Defendant admits the allegations of Paragraph No.: 69.

70. Defendant admits to certain allegations of paragraph No: 70, only to Quest using an administrative non judicial process in an attempt to dispute and arbitrate outside of the court systems, which would be in violation of section (6.1) in the agreement **(See PHCS contract attached as Exhibit A,)** which is what Plaintiff chose, and the reason Defendant was sued, and is answering this complaint.

71. Defendant is without knowledge to admit or deny the allegations of Paragraph No.: 71.

72. Defendant admits the allegations of Paragraph No.: 72.

73. Defendant admits the allegations of Paragraph No.: 73.

74. Defendant denies the allegations of Paragraph No.: 74. **(See attached PHCS contract section 9.4 letter (b) attached as Exhibit A.**

75. Defendant denies the allegations of Paragraph No.: 75.

76. Defendant denies the allegations of Paragraph No.: 76.

77. Defendant denies the allegations of Paragraph No.: 77. Section 3.7 of the Agreement does not allow for amending of my PHCS contract. No amendments to the contract can be performed without mutual consent in writing signed by participating provider, as well as PHCS **(See section 9.2 of the PHCS contract attached as Exhibit A.)** Section 3.7 only allows the designation of the products in which Defendant has agreed to, and also only allows modification of the administrative handbook. It does not allow any amending of the contract Agreement itself. Section 3.7 can allow for additional payers to be added within the PHCS network, and would have to be governed by the PHCS contract. **(See PHCS contract attached as Exhibit A)** Workers compensation, being a state mandated program, purchased by the employer, and used by an employee only in the event of an injury, fails to meet the requirements of the contract specifically 1.1, 1.3, 1.5, 4.2, 4.4, 4.5,7.3, 7.5, and also the re-pricing of the claims violates Mississippi workers compensation rules and regulations, **(See Rules and Regulations Mississippi Workers Compensation Commission regarding billing and reimbursement rules of medical claims attached as Exhibit G.)** Sections 4.1, 9.1, and 9.3 of the PHCS contract **(See PHCS contract attached as Exhibit A)** would make workers compensation severable from the agreement as per violations in Exhibit G.

78. Defendant denies the allegations of Paragraph No.: 78.

80. Defendant denies the allegations of Paragraph No.: 80.

81. Defendant admits the allegations of Paragraph No.: 81.

82. Defendant is without proper knowledge to admit or deny the allegations of Paragraph No.: 82.

83. Defendant is without proper knowledge to admit or deny the allegations of Paragraph No.: 83.

84. Defendant is without proper knowledge to admit or deny the first paragraph of No.: 84, but denies the rest of Paragraph No.: 84.

85. Defendant denies the allegations of Paragraph No.: 85.

86. Defendant denies the allegations of Paragraph No.: 86

87. Defendant denies the allegations of Paragraph No.: 87.

88. Defendant denies the allegations of Paragraph No.: 88.

89. Defendant denies the allegations of Paragraph No.: 89.

90. Defendant denies the allegations of Paragraph No.: 90.

91. Defendant denies the allegations of Paragraph No.: 91.

92. Defendant denies the allegations of Paragraph No.: 92.

93. Defendant denies the allegations of Paragraph No.: 93.

94. Defendant denies the allegations of Paragraph No.: 94.

95. Defendant denies the allegations of Paragraph No.: 95.

96. Defendant denies the allegations of Paragraph No.: 96.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE:

## BREACH OF CONTRACT OF ALTERNATIVE DISPUTE RESOLUTION

1. In section (6.1) of the PHCS contract it stipulates as to any events and problems that arise under this agreement. It states parties to such problems or disputes will meet and seek resolution in good faith. Except in section (2.6) appeal of termination, any controversy or claim arising out of or relating to this agreement or the breach thereof, (which is "no", so resolved) will be settled by binding arbitration in accordance with the American Health lawyers Association Alternative Dispute Resolution Service Rules of Procedure or Arbitration, and judgment on the award by the arbitrator(s) may be entered in any court having jurisdiction thereof.

2. Plaintiff, MultiPlan instead of requesting arbitration based on the ADR clause section (6.1) instead chose to file suit in direct violation of this section of the agreement.


## SECOND AFFIRMATIVE DEFENSE:

### FAILURE OF CONSIDERATION

1. In any contract there must be contractual consideration addressed that protects both parties to the contract and allows both parties to benefit in some form or fashion by agreeing to and signing said contract. In a PPO contract the consideration performed by the PPO contract company is to facilitate marketing and direction in order to facilitate and increase patient volume for the provider.

In the PHCS agreement, consideration on behalf of the participating provider is an agreement to discount their services at an agreed upon rate established in the contract. The returned consideration by the PPO company is to insure that all payers they contract with, market or steer patients to the providers by way of primarily financial incentives to choose an in network provider for the cost savings verses an out of network provider which would not facilitate any savings. In Section 4.5 of the Agreement, PHCS will require all payers to make available and promote contracts which provide Direction to preferred providers. Direction my occur through (i) greater plan benefits IE, financial incentives to choose network provider, (ii) access to lists or directories of preferred providers in printed form or website, or (iii) the provision of financial incentives that provide covered individuals with savings when they obtain health care services from preferred providers.

2. The second part of consideration to insure patient volume to the provider and to denote which patients are legally a part of the PPO network is done through identification and Eligibility. In the 4.4 of the Agreement, PHCS will require each payer to furnish covered individuals with a means of identifying themselves to the participating professional as covered under a contract for the provision of the health care services through the PHCS network. Such methods of identification may include (i) identification cards that indicate an affiliation with PHCS, (ii) affixing the PHCS logo to identification cards, or (iii) a PHCS phone number identifier.

3. The facts as addressed to point (1) above are as follows; (A) Workers compensation is a state mandated program that is purchased by the employer of a company and is only transferred to the patient in the event of an injury, therefore the patients do not

have an individual contract which is a violation of the agreement sections (1.1), (1.3), (1.5).

(B) Workers compensation patients in the state of Mississippi are directed to physical therapists by their treating physician as stipulated for in the Mississippi workers compensation rules and regulations, therefore no direction can occur by way of a benefit plan.

(C) Workers compensation being a state mandated plan and covered by the rules and regulations of the Mississippi Workers Compensation Commission has a fee schedule set by the commission and under the rules, all claims are paid in full by the plan leaving the patient with no out of pocket expense what so ever. Therefore there is no financial incentive for the patient to choose a specific provider due to no financial savings for the patient. Anyway, they are directed by their physician. So, no direction could or was performed based on those facts.

4. The facts as stated above based on the structure and language of the Agreement prove beyond a doubt that workers compensation, based on the fact that it is a state mandated program, is not an individual health insurance plan, and thus, cannot provide identification cards to its members as the plan is only used when an employee suffers an injury. Direction cannot be provided by any payer or the PPO contract company itself as in Mississippi direction of patient care for physical therapy is by the referring physician. Finally, there can be no financial incentives in the form of savings for the patient whatsoever as payment is in full as provided for in the rules and regulations of the workers compensation commission. All of this goes to prove that there could not be any consideration in the form of financial incentives by way of financial savings to the patient or the ability to choose a provider from a list as the direction comes from the physician and there is no financial difference to the patient no matter who treats them. Also there can't be, and there was no method of identification to establish the patients were a member of the PHCS network and eligible for the PPO discounts. Therefore Plaintiff, MultiPlan's workers compensation network product only provides consideration for the payers and the PPO company without any consideration for the providers whatsoever. This is in direct violation of the agreement.

### THIRD AFFIRMATIVE DEFENSE

#### FRAUD

1. Plaintiff, MultiPlan unilaterally enrolled Defendant into their workers compensation data exchange with Coventry in 2012 after they announced that on March 1st of 2012

they were now offering a workers compensation specialty network. This was the first time this network was provided by MPI as per press announcements. They did not seek Defendant's consent and did not have my approval to enroll me into a separate program from PHCS as their worker's compensation is even denoted on their website as a Plaintiff, MultiPlan's specialty network, not a PHCS network.

2. Plaintiff, MultiPlan, when first faced with Defendant's disputes on these discounts and later when faced with the disputes by Quest Recovery stated that there was not an amendment completed during the integration, that the language in my PHCS Agreement that would allow for workers compensation and auto medical networks was already addressed in the PHCS contract under section 1.1. This statement was first made by Mara Perez and later affirmed by Nina Conway, both being employed by Plaintiff, and both directly contradict stated facts by Plaintiffs council in their pleading in sections 19-23. Those sections state as fact that the contract was amended to include workers compensation authorized by the agreement and they provided notification of said changes in a notice to Defendant. However, section 1.1 states a contract means any insurance policy, benefit plan or other health plan or program that includes direction, which is a requirement that workers compensation can not fulfill based on it being a state mandated program without the ability for direction either via referral or financial benefits for the patient in choosing the provider. A workers compensation product or network could never fit within the guidelines and governance of the PHCS agreement according to sections (1.1), (1.3), (1.5), (4.1), (4.4), (4.5) as well as (3.7) in which the Plaintiffs want the court to believe allowed the amendment to the agreement. Section (3.7) only allows for modification of the administrative handbook and for designation of particular products I participate in as part of the PHCS network. Plaintiff, MultiPlan's workers' comp. network is NOT a PHCS network. Also, the previous sections in the agreement would contradict with a workers compensation product, and, the fact that the claims were re-priced post treatment; sections (9.1) and (9.3) would severe the workers compensation product as they state that the contract will be construed to abide by all laws, rules and regulations of the state in which the health care services are performed which in Mississippi would prohibit re-pricing without mutual agreement and any separate fee contract shall automatically include all rules and regulations of the fee schedule including the re-pricing paragraph.

3. Upon continued dispute of the discounts, Plaintiff, MultiPlan's representative (Ms Conway) states that workers compensation rules and regulations allow for a separate fee contract, however Ms Conway once again purposely omits the last paragraph in the section on re-pricing and separate fee contract which states that if a separate fee contract exists, that it SHALL contain all rules and regulations of the fee schedule which would include no re-pricing of claims without mutual agreement.

4. Faced with continued disputes of the unauthorized discounts, Plaintiff, MultiPlan stated that their contract fits within the laws of the State of Mississippi but this time when trying to address the issue of re-pricing and the rules and regulations that prevent it without mutual agreement, Tanya Fissette, a Resolutions Services manager for Plaintiff, MultiPlan states that the rules governing re-pricing only apply to post care which is different from the network agreement with Plaintiff, MultiPlan. Ms Fissette also purposely omits the last paragraph under the rules and regulations governing re-pricing which states that any separate fee contract, which would dictate that the PHCS contract, shall include all rules and regulations of the fee schedule which includes no re-pricing without mutual consent. Ms Fissette goes on to state as fact that I had a contractual relationship with PHCS from September 1, 2007 through September 25, 2012 and that workers compensation was a valid product offered by PHCS through that contract. What Ms Fissette fails to say is that (i) Plaintiff, MultiPlan only started that network in 2012, (ii) the Plaintiff, MultiPlan workers compensation specialty network is a separate network and not a part of the PHCS network, and (iii) no matter if a purported contract even existed or was able to be amended without my agreement and consent, due to the rules and regulations of the Mississippi Workers Compensation Commission that state it shall include all rules and regs contained including no re-pricing without mutual agreement. Therefore sections (9.1) and (9.3) of the agreement would make the workers compensation severable from the agreement do to the violations of state law.

5. Finally,  after all their misrepresentations as justifications of the discounts were not successful in preventing the disputes or answering them legally, and under pressure from their client Coventry as to not lose that portion of their business,  Plaintiff, MultiPlan filed suit against me and Quest in Federal District Court, Southern District of Mississippi. However, in contrast to Plaintiff, MultiPlan's previous justifications that my PHCS Agreement was never amended, in the Plaintiffs pleading as prepared by Ms Pickering, the justification is now changed that my contract was indeed amended to include workers compensation and that in 2007 a letter was sent to me notifying me of said amendment and addition of workers compensation as a product or new network addition. However in that letter that was referenced by the Plaintiff. There is no mention whatsoever of any amendments to my PHCS contract to include workers compensation. In fact it states that my existing individual contract with PHCS remains in effect. The Plaintiff goes on to state that the amending of the contract was authorized by the agreement upon prior written notice as to satisfy section 3.7 of the PHCS contract. However, Plaintiff, MultiPlan did not have a workers compensation network at that time and only four years later did they acquire one in their acquisition of Viant, and did not announce that network availability until March 1st 2012. So in essence, Plaintiff, MultiPlan and their council wish the court to believe that they had legal rights to amend

my contract without my consent (9.2) and notified me of said amendment in a 2007 letter which has no mention whatsoever of workers compensation, all in an effort to justify the addition of a network that did not exist at that time, and was not available until 2012. Furthermore, a workers compensation product does not comply with the requirements of the PHCS contract. The fact is that all of this defense has been created and falsified after the fact and done so to protect their contract with their client Coventry. Affirmation of this can be found in the affidavit of Kelly Basel submitted by the Plaintiff in evidence which addresses the fact that losing their contract with Coventry would constitute a substantial loss of revenue.

6. The Plaintiff, MultiPlan's workers compensation specialty network did not even exist until after the aquisiton of Viant in 2010 and the announcement of the Plaintiff, MultiPlan workers compensation network in March of 2012. I offer two other letters sent by Plaintiff, MultiPlan to my practice; the first dated May 4th of 2010 and the second dated January 10th of 2011, neither of which, denote any participation whatsoever in Plaintiff, MultiPlan"s Workers Compensation Network. Thereby again proving that the stated fact by the Plaintiff that the 2007 letter notified Defendant of an amendment to my PHCS contract to include workers compensation is a blatant false statement and goes to fraud in this case and this justification was construed after the fact so as to protect their client Coventry as shown by all letters entered into evidence by defense in this case.

7. In trying to justify and validate the unauthorized discounts and to protect their contract relationship with their client Coventry, Plaintiff, MultiPlan's defense of the discounts have run the gambit; "the Agreement allows for workers compensation", "workers compensation was always a part of the contract", "MPI had a contract that abides by the laws of the state", "the Mississippi workers compensation rules and regulations about re-pricing are only meant for post treatment", "your contract was actually amended in 2007 to include workers compensation products and we notified you of such on or around 2007". The facts of the matter are far different than (the jumbled efforts by numerous employees of Plaintiff, MultiPlan) and finally by their council in this suit. Fact (1) Stating that the language was always in the contract is false as the contract was written to govern commercial health insurance plans and the sections within said contract are structured to address issues specific to that type insurance policy. Workers compensation being a state mandated product purchased by an employer and only used by an employee in the event of an injury can not and will not fit into the constraints of the agreement as documented above. (2) Workers compensation rules and regulations in the state of Mississippi prevent re-pricing of claims and stipulate that if a separate fee contract exists it shall automatically incorporate all rules and regulations including the paragraph regarding no re-pricing of claims without mutual consent. (3) The claims were re-priced post treatment and after the fact. The first notice that any

PPO agreement provided validity for discounts were well beyond treatment and only appeared on the patients EOBs. (4) Plaintiff, MultiPlan did not even have a workers compensation product or network in 2007, so there was absolutely no way that they could have notified Defendant of such in their May 26th of 2007 notice which shows that was a blatant false statement and goes to fraud in an effort to after the fact protect their relationship with Coventry. (5) Not only can the contract not be amended legally without Defendant's consent according to section (9.2), and not only could workers compensation not be included in the PHCS network due to failure to comply with the majority of the sections contained in the agreement, the most important aspect of any PPO contract, direction could not and was not performed, therefore any discounts in lei of such would be null and void. (6) Finally, not only would workers compensation not fit into the PHCS contract and not only was it a product or network that did not exist in 2007, the crux of this lawsuit is based on a lie that Defendant was notified of the addition of said amendment in that May 26th of 2007 notice and the actual letter shows that not only did Plaintiff not have legal grounds to amend Defendant's contract based on the constraints and governance of the contract and not only did they not even have that product or network at the time, their pleading saying it was, when the letter clearly shows different. Once again showing this was all done after the fact and constitutes fraud in an effort to protect Plaintiff's relationship with their client Coventry.

8. Coventry, after purchasing the unauthorized discounts from Plaintiff, MultiPlan placed them into their online database in which their client Mitchell Inc could purchase them through Coventry/First Health. Coventry is not a payer within the PHCS network and can not fit the definition of payer as defined in section (1.5) of the agreement. Coventry is an aggregator client as admitted to by the sworn affidavit of Kelly Basel submitted in support of the Plaintiffs pleading and therefore is self admission that they are not a payer and their relationship with Plaintiff, MultiPlan violates sections (1.1), (1.3), (1.5) of the agreement. Coventry is also not able to provide steerage based on sections (4.4) and (4.5) of the agreement, yet knowing they were not a part of the PHCS network, knowing they could not fulfill the definition of payer under the contract, knowing they could not provide any steerage or direction under the contract still profited from the discounts by selling them to their client Mitchell, Inc. Even after being notified by certified correspondence that the my purported contract with Plaintiff for workers compensation was not legal or valid and being notified that the discounts were in direct violation of Mississippi workers compensation rules and regulations Plaintiff's client still stood by their fraud in taking the proprietary discounts without legal authority and refused to admit to their un-authorization or rescind them.

9. Mitchell Inc., after purchasing the unauthorized discounts from Coventry applied them to claims submitted by me to the insurance companies of Sentry, EMC and Strategic

Comp, (all clients of Mitchell Inc.) through cost containment and re-pricing agreements with each. Mitchell Inc is not a payer as defined in section (1.5) of the agreement, but is a cost containment and re-pricing company and does not have contracts with providers and strictly relies on its contracts with companies like Coventry to provide discounts as admitted by their in house counsel Lori Browne in an email to Quest Recovery. Mitchell Inc, is not a part of the PHCS network and can not provide steerage or direction as provided for in sections (4.4) and (4.5) of the agreement.  Even after being notified by certified correspondence that the Defendant's purported contract with Plaintiff's client for workers compensation was not legal or valid and being notified that the discounts were in direct violation of Mississippi workers compensation rules and regulations Plaintiff's client still stood by their fraud in financially benefiting from the proprietary discounts without legal authority and refused to admit or recompense them.

10. EMC Insurance received financial benefit from the unauthorized discounts through their cost containment contract with Mitchell Inc, through the process of re-pricing the claims Defendant submitted to them for payment of services by Mitchell, EMC was able to profit from said discounts. EMC is not in the PHCS network and thus had no legal or contractual rights to the discounts. EMC did not provide steerage or direction as would be required in sections (4.4) and (4.5) of the agreement. Even after being notified by certified correspondence that the Defendant's purported contract with Plaintiff's client for workers compensation was not legal or valid and being notified that the discounts were in direct violation of Mississippi workers compensation rules and regulations Plaintiff's client still stood by their fraud in financially benefiting from the proprietary discounts without legal authority and refused to admit their un-authorization or rescind them.

11. Strategic Comp Insurance received financial benefit from the unauthorized discounts through their cost containment contract with Mitchell Inc, through the process of re-pricing the claims Defendant submitted to them for payment of services by Mitchell Inc, Strategic Comp was able to profit from said discounts. Strategic Comp is not in the PHCS network and thus had no legal or contractual rights to the discounts. Strategic Comp did not provide steerage or direction as would be required in sections (4.4) and (4.5) of the agreement. Even after being notified by certified correspondence that the my purported contract with MPI for workers compensation was not legal or valid and being notified that the discounts were in direct violation of Mississippi workers compensation rules and regulations Plaintiff's still stood by their fraud in financially benefiting from the proprietary discounts without legal authority and refused to admit to their un-authorization or rescind them.

12. Sentry Insurance received financial benefit from the wrongful discounts through their cost containment contract with Mitchell Inc, through the process of re-pricing the claims

Defendant submitted to them for payment of services by Mitchell, Sentry was able to profit from said discounts. Sentry is not in the PHCS network and thus had no legal or contractual rights to the discounts. Sentry did not provide steerage or direction as would be required in sections (4.4) and (4.5) of the agreement. Even after being notified by certified correspondence that the Defendant's purported contract with Plaintiff for workers compensation was not legal or valid and being notified that the discounts were in direct violation of Mississippi workers compensation rules and regulations Plaintiff's client still stood by their fraud in financially benefiting from the proprietary discounts without legal authority and refused to admit or recompense them.

## FOURTH AFFIRMATIVE DEFENSE

## FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

1. Plaintiff, MultiPlan, when faced with legal disputes regarding re-priced workers compensation claims from their purported contract amendment to Defendant's PHCS contract; instead of performing an actual investigation, negotiating in good faith and answering the affidavits sent by certified notice from Quest Recovery, chose instead to state the case is closed and instead of allowing for an administrative process to arbitrate and settle the disputes Plaintiff chose to file a harassing and frivolous lawsuit against both Defendant and Quest Recovery in an attempt to provide cover for their fraud as well as protect their clients from being exposed for the fraud perpetrated by all parties in this case.

2. Plaintiff in this case were notified of the lack of a legal and valid contract to provide for Defendant's discounts as well as the fact that Plaintiff by taking and profiting on the unauthorized discounts were in violation of Mississippi law governing the billing and payment of workers compensation medical claims. When notified by certified correspondence on the issues above, Plaintiff chose not to allow for any administrative remedy to settle the issue and instead relied on Plaintiff, MultiPlan to take action in Federal Court in an effort to provide cover and protection for all involved.

## FIFTH AFFIRMATIVE DEFENSE
## ILLEGALITY

1. As the fifth affirmative defense, the Defendant asserts *illegality* as the Plaintiffs claims are barred, in whole or in part, by the doctrine of illegality in that the contract forming the basis of Plaintiffs causes of action violates the law of the State of Mississippi, as set forth in the Plaintiffs claims. Plaintiffs claims are further barred by illegality arising from Plaintiffs failure to comply with rules and regulations of the rules

and regulations of the State of Mississippi Workers Compensation Commission in reference to re-pricing of claims and separate fee contract.

2. The rules and regulations of the State of Mississippi workers compensation commission clearly address the issue of re-pricing claims stating that no claims can be re-priced without mutual consent of both parties involved.

3. The rules and regulations also set forth that in the event of a separate fee contract that it shall automatically included all rules and regulations in the fee schedule which is address above in number 2.

## SIXTH AFFIRMATIVE DEFENSE

**FAILURE TO PERFORM**

1. Under the PHCS contract stipulations and governance the Plaintiff failed to perform all duties and obligations on its part in part or in whole with regards to sections (1.1), (1.3), (1.5), (4.4), (4.5), (9.1), (9.2) and (9.3).

2. By allowing clients to access Defendant's proprietary discounts without meeting the requirements set forth in the agreement sections noted above, Plaintiff, MultiPlan failed to perform its duties and obligations to said agreement and in governance of said agreement. The failure to perform allowed all parties to profit from accessing said discounts.

## SEVENTH AFFIRMATIVE DEFENSE

**BREACH BY PLAINTIFF**

1. Plaintiff breached the contract by unlawfully amending my PHCS agreement in the following sections; (1.1), (1.3), (1.5), (4.1), (4.4), (4.5), (9.1), (9.2) and (9.3)

## COUNTERCLAIM

**Comes now,** the Defendant, Steven W. Holland d/b/a Physical Therapy Clinic of Gulfport, and files this his Counterclaim against Plaintiffs, alleges and states as follows:

1. In June of 2006, Defendant entered into a commercial insurance contractual relationship with Private Healthcare Systems ("PHCS"). In this contractual relationship, Defendant agreed to accept discounted fee rates on certain patients directed to

Defendant by PHCS with corresponding identification cards identifying themselves as PHCS enrollees.

2. In consideration for the discounted fee rates, PHCS agreed to market Defendant's business on their network of providers, and contractually bind their health plan payer clients to direct patients to me through financial incentives, and provide their patients with PHCS identification cards, so that upon the patients admission, Defendant would know that the patient was directed to Defendant and therefore the insurance payer is entitled to the agreed upon discounted fee rates.

3. Defendant's contract agreement with PHCS was for commercial insurance only. It did not include workers' compensation, and was never mentioned during Defendant's negotiations with PHCS.

4. Defendant did not have any reasonable expectation for workers' compensation to be later incorporated into Defendant's contract agreement with Plaintiff, PHCS because the components and governance of the contract is in contrast to any workers' compensation plan, therefore, since workers' compensation is in contrast to components and governance of the Agreement, if Plaintiff PHCS intended to incorporate it later as part of Defendant's Agreement, that would be **fraudulent concealment** of a material fact.

5. According to Mississippi Workers' Compensation Rules and Regulations, the attending physician is the party who directs patients to a Physical Therapists, therefore, there is no need for Defendant to obtain direction from any PPO as it would be impossible.

6. State mandated workers' compensation insurance pays 100 percent of the patients bills leaving no patient liability. These mandated payment arrangement and Mississippi Workers' Compensation Rules do not leave any way to create patient direction. Therefore, Defendant would have no reason to join a workers' compensation network and give out discounts on Defendant's workers' compensation claims when Defendant cannot receive any benefit in return. Defendant would only lose revenue in doing so.

7. Defendant was satisfied with the contractual relationship with Plaintiff, PHCS and did not have any issues arising from our contractual relationship until after Plaintiff, PHCS was acquired by a silent PPO organization, Plaintiff, MultiPlan, Inc., and when Plaintiff, MultiPlan began unilaterally enrolling Defendant into their silent PPO networks without Defendant's consent.

8.    During  the  first  half  of  the  year  2012,  Defendant  began  having  workers'
compensation claimed reimbursements discounted.  The explanation of benefits named
Plaintiff, MultiPlan  as  the  PPO  that  Defendant  has  contract  with  allowing  for  the
discounting of Defendant's workers' compensation claims.  However, Defendant did not
have any workers' compensation discount/repricing agreement with Plaintiff, MultiPlan.

9. Therefore,  Defendant  called  Plaintiff,  MultiPlan,  and  disputed  the  discounts.
Defenant was told by a Plaintiff, MultiPlan representative that they can do pretty much
whatever they want with Defendant's claims, and there was nothing Defendant could do
about it.

10. In July of 2012, Defendant contacted Kevin Barrett d/b/a Quest Financial Recovery
Services ("Quest") through his website at www.questfrs.com.

11. Kevin Barrett d/b/a Quest Financial Recovery Services is in the business of auditing
healthcare providers' claimed reimbursements to determine if unauthorized discounts
have been applied by what is commonly known in the healthcare insurance industry as
a silent PPO organization.  Mr. Barrett then seeks reimbursement of such unauthorized
discounts on behalf of healthcare providers.

12. In  the  healthcare  insurance  industry,  a  legitimate  PPO  (Preferred  Provider
Organization) is a network of healthcare providers who agree to offer discounted fee
rates in return for receiving increased patient referrals (patient steerage).  In contrast, a
silent PPO is an organization who, on one hand, contracts with legitimate PPOs for
access of their network providers' contracted fee rates, and on the other hand, create
cost containment contracts with entities allowing buyers into the silent PPO database of
providers'  proprietary  healthcare  provider  contractual  fee  rates  without  binding  the
entities  or  buyers  to  the  contractual  obligations  of  the  healthcare  provider/PPO
agreement, e.g. patient steerage.

13. Through  the  silent  PPO  scheme,  insurance  payers  can  buy  into  the  silent  PPO
database (most likely through another entity like a bill review/repricing vendor) and
access  the  lowest  discounted  rate  of  the  providers  after  the  healthcare  providers
provide services to the patient, even though the patient is not directly a member of the
PPO  plan  contracted  with  the  healthcare  provider  with  contractual  right  to  the  PPO
discounted rate.

14. Silent PPOs exist solely for the purpose of selling access to healthcare providers'
proprietary contractual fee rates as a means of providing cost containment for payers of
non-PPO healthcare  claims  that  are  not  entitled  to  a  PPO  discount.    This  scheme

creates substantial profits for the silent PPOs, the middle-man entities in the scheme; and creates substantial savings for the payers.  However, it does not create any benefit for the healthcare providers whatsoever and only brings them financial harm.  The American Medical Association has categorically taken the position that silent PPOs are fraudulent, and has estimated that healthcare providers lose up to $3 billion dollars a year in revenue to the silent PPO scheme.

15. Even though silent PPOs are illegitimate, PPOs get away with contracting with silent PPOs by misrepresenting language in the healthcare provider/PPO agreements that allow "payers" right to the proprietary contractual fee rates.  In a healthcare provider/PPO agreement, it is designed to create patient steerage to the healthcare providers in return for a discounted fee rate.  Therefore, in a legitimate setting, the PPO will contract with health plan payers and bind the payers to create member (patient) contracts in which the members have financial incentives to visit healthcare providers within the PPO network, e.g., the health plan payer will pay higher benefit levels when the patient visits a healthcare provider within the network as opposed to paying lower benefit levels when the patient visits healthcare providers not in the network (out-of-network providers).

16. The healthcare provider/PPO agreement will typically obligate the PPO to bind the health plan payers to provide their patient members with identification (PPO ID cards,) so that the healthcare providers know at the time of patient admission that the patient was directed to the provider and the payer is therefore entitled to a discount according to the "identified" PPO agreement.

17. PPOs will usually misrepresent the word "payer" in the healthcare provider/PPO agreement by stating and/or implying that their clients (the silent PPOs) are a "payer-client" according to the provider/PPO agreement, and therefore, falsely represent that the silent PPO has right to the proprietary contractual fee rates.  However, the silent PPOs are in no way a health plan payer as per terms of most PPO agreements and therefore cannot/do not fulfill the payers' contractual obligations to create patient steerage and only take discounts without creating any benefits whatsoever for the healthcare providers in return for the discounts.

18. Upon Mr. Barrett reviewing my explanation of benefits and PPO agreements, Mr. Barrett contacted Plaintiff, MultiPlan, and disputed their right to sell discounts on Defendant's workers' compensation claimed reimbursements.  Mr. Barrett informed Plaintiff, MultiPlan that Defendant do not have any agreement with Plaintiff, MultiPlan for the repricing/discounting of my workers' compensation claims.

19. Plaintiff, MultiPlan (as the acquired owner of Private Healthcare Systems (PHCS)) relayed to Mr. Barrett that Defendant did have a contract agreement (the "Agreement") with Plaintiff, PHCS and the Agreement includes workers' compensation.

20. Mr. Barrett disputed Plaintiff, MultiPlan's claim that the PHCS Agreement includes workers' compensation. In response, Plaintiff, MultiPlan referred Mr. Barrett to section 1.1 of the Agreement that provides the definition of the word "Contract" which states:

21. Contract means any insurance policy, benefit plan or other health plan or program that includes Direction (as defined in Section 4.5) to Preferred Providers.

22. Section 4.5 states: Marketing. PHCS will require each Payor to make available and promote Contracts which provide Direction to Preferred Providers. Direction may occur through, but is not limited to, (i) greater plan benefits, (ii) access to lists or directories of Preferred Providers in printed form or by phone or website, or (iii) the provision of financial incentives that provide Covered Individuals with savings when they obtain health care services from Preferred Providers.

23. Plaintiff, MultiPlan stated that their workers' comp clients have access to the Plaintiff, MultiPlan website listing the providers and this meets the requirement under the provider's Agreement.

24. The justification of the discounts provided by Plaintiff, MultiPlan is a gross misrepresentation of the facts. The Agreement is structured for commercial insurance only. This is clear by section 4.2 that states that each Payor Acknowledgement between PHCS and the Payor will obligate the Payor to pay or arrange to pay for Covered Care rendered to Covered Individuals in accordance with the provisions of Article VII of the Agreement. And, section 7.3 of Article VII states: Billing of Covered Individuals. (a) For Covered Care, Participating Professional will bill or collect from a Covered Individual all co-payments, as specified in the Covered Individual's Contract.

25. Subsequently, state mandated workers' compensation insurance plans are employer contracts that an employ benefits from only if there is a work related injury, therefore, the patients are not "Covered Individuals" under "Covered Individual Contracts". Additionally, state mandated compensation insurance plans do not include co-payments. Under workers' compensation insurance plans, the healthcare services are fully paid for by the insurance and the workers' compensation patients do not have any liability, e.g. co-payments.

26. The word "contract" in the Agreement as mentioned in section 7.3, clearly cannot include a workers' compensation contract as falsely represented by Plaintiff, MultiPlan, because, a workers' compensation contact is not with individuals and does not include any patient liability.

27. Mr. Barrett informed Plaintiff, MultiPlan of the Mississippi Workers' Compensation Billing and Reimbursement Rules that state that no party is obligated to a re-pricing agreement of any kind whatsoever, and whoever states or implies that a party must consent will be guilty of a felony, and thus, Defendant did not agree to any repricing of my workers' compensation claims. Additionally, Mr. Barrett informed Plaintiff, MultiPlan that Defendant did not allow any renting/leasing of Defendant's PHCS proprietary contractual fee rates to non-PHCS policy members (silent PPO discounting).   After being made aware of this fact the unauthorized discounts were still not rescinded.

28.  Mr. Barrett requested a dispute resolution from the Mississippi Workers' Compensation Commission, specifically Scott Clark, Senior Attorney.

29. Kevin Barrett contacted Plaintiff, MultiPlan again to further dispute the discounts. He informed Plaintiff, MultiPlan that the Agreement states in section 9.2 that the Agreement may not be modified, or amended except by mutual consent in writing signed by Participating Professional and PHCS.

30. Plaintiff, MultiPlan responded and stated that the Agreement was not amended and that workers' compensation was already included in the Agreement.  Plaintiff, MultiPlan then further stated that the case was "closed".  The statement from Plaintiff, MultiPlan at the time that Defendant's contract was not amended is in contrast to Plaintiff, MultiPlan's claim to the court that Defendant's contract was amended upon written notice to Defendant.  Therefore, proving Plaintiff, MultiPlan's continued contradicting misrepresentations.

31. Mr. Barrett realized that Plaintiff, MultiPlan was going to ignore the Mississippi Workers' Compensation Law, and stand by their misrepresentations.  It was after this that Mr. Barrett began searching for a way to continue the dispute process as Plaintiff, MultiPlan closed the dispute case in violation of section 6.1 of the Agreement that states that if a dispute cannot be resolved, both parties agree to settle the dispute by binding arbitration in accordance with the American Health Lawyers Association Alternative Dispute Resolution Services Rules of Procedure for Arbitration.

32. Defendant did not have financial means to request arbitration as according to the Agreement; therefore, Defendant needed a way to get Plaintiff, MultiPlan to reopen the dispute, which they had wrongfully closed in breach of section 6.1 of the Agreement.

33. During Mr. Barrett's search, he came across a non-judicial process called the "Commercial Affidavit" process. This process was predominantly known to be used by those commonly known as people of the "Sovereign Citizen Movement".   The sovereign citizen individuals typically used the process on government officials, and afterwards place a commercial lien on the officials.

34. To Defendant's knowledge, Mr. Barrett is not a sovereign citizen, and did not intend to use the Commercial Affidavit process on any government officials.  By way of the Commercial Affidavit process, Mr. Barrett sent by certified mail an affidavit to Plaintiff, MultiPlan, and made claims against Plaintiff, MultiPlan for their falsified workers' comp agreement with me and their silent PPO activity.  Also, Mr. Barrett sent an affidavit to each of the parties involved in the silent PPO scheme who were not authorized to access my proprietary contractual fee rates.  Additionally, Mr. Barrett informed Plaintiff, MultiPlan and each party that Defendant did not agree to any repricing of Defendant's workers' compensation claims and the Mississippi Law states that no party is obligated to any such agreement.

35. In the affidavits and letters that Mr. Barrett mailed by certified mail to Plaintiff, MultiPlan, and Coventry, and each other party, they were given thirty (30) days to rebut Mr. Barrett's claims, and thus prove authorization of the discounts, or settle.  Also, in Mr. Barrett's affidavits to Plaintiff, MultiPlan, and each party, he informed them that their failure to rebut his claims or settle within the 30 days would invoke the doctrine of "estoppel by acquiescence" and thereby constitute an affirmation of all statements made in the affidavit allowing for the recovery, in commerce for damages, penalties and costs resulting in a lien being filed upon their failure to settle for said damages, penalties and costs.  Subsequently, Plaintiff, MultiPlan, and each party, failed to rebut Mr. Barrett's claims.   Even if the lien was wrong or unfair, by the doctrine of "estoppel by acquiescence" and "estoppel by laches", Plaintiff, MultiPlan, and each party, waived their rights to any injunctive relief arising from a lien.

36. Coventry, who was the silent PPO, and purchased access to Plaintiff, MultiPlan's falsified workers' comp fee agreement with Defendant, and received Mr. Barrett's Commercial Affidavit on May 5, 2014.

37. In the Commercial Affidavit, Mr. Barrett informed Coventry that Defendant did not agree to any re-pricing of my workers' compensation claims, and thus, Coventy is

falsifying Defendant's agreement to any discounts.  Mr. Barrett also informed Coventy that they did not have right to my PHCS Agreement, and that they were conducting silent PPO activity, and falsifying themselves as having contractual right to the Agreement.

38. Mr. Barrett gave Coventry thirty (30) days to rebut his claims in order to establish their authorization to sell discounts on my workers' comp claims or settle.  Also, Mr. Barrett informed Coventry that their failure to rebut my claims or settle within the 30 days would invoke the doctrine of "estoppel by acquiescence" and thereby constitute an affirmation of all statements made in his affidavit allowing for the recovery, in commerce for damages, penalties and costs resulting in a lien being filed upon their failure to settle.  Coventry failed to rebut Mr. Barrett's claims; therefore, he sent a notice of fault which was received by Coventry on June 12, 2014.

39. In the notice of fault letter, Mr. Barrett informed Coventry of their fraud in this matter and again warned that a lien would be filed against Coventry upon their failure to prove authorization of the discounts or settle.

40. On June 11, 2014 Mr. Barrett was contacted by First Health (a subsidiary of Coventry) in reference to another matter.  Mr. Barrett mistakenly assumed that the contact was referencing his demand letters to Coventry.  However, he was corrected by a First Health Director and Counsel (Venus Davlin) where she had stated that First Health is strictly a non-workers' compensation business.

41. This information from Ms. Davlin is further confirmation of willful misrepresentation and fraud conducted by Coventry because in Mr. Barrett's dispute with the repricing vendor (Mitchell) who provided the discounts to two of Defendant's workers' comp payers, claimed that their cost containment contract agreement was with First Health. First Health is not even a workers' compensation business, and does not provide any workers' compensation plans or products, yet, through First Health's relationship with Coventry, First Health fraudulently obtained access to worker's compensation plan discounts and then provided those discounts for a bill review/repricing vendor (Mitchell).

42. Shortly after Mr. Barrett's communication with First Health, he was then contacted by Kelly Feurer, Coventy's Director and Counsel, informing Mr. Barrett that she would contact Plaintiff, MultiPlan in reference to the dispute over the unauthorized discounts, and respond within the 25 days demanded in Mr. Barrett's Notice of Fault letter.

43. Mr. Barrett received a letter from Plaintiff, MultiPlan's counsel (Mr. Craig Caesar, with Baker Donelson Bearman, Caldwell & Berkowitz, PC), representing Plaintiff, MultiPlan and Coventry Health Care.

44. Mr. Barrett then responded to Plaintiff, MultiPlan's counsel, and rebutted his accusations against Mr. Barrett, and informed Plaintiff, MultiPlan's counsel of the Mississippi Law making the discounts unlawful.

45. Mr. Barrett discovered that Coventry's corporate office was at Aetna's corporate office as Aetna was Coventry's parent company.  Therefore, Mr. Barrett mailed a certified letter to Aetna, informing them of his intention to file a lien and criminal charges pursuant to Coventy's consensual default as according to the doctrine of acquiescence in their failure to rebut Mr. Barrett's claims of the unauthorized discounts or settle. Aetna received the letter on July 28, 2014.

46. After receiving the notice of a lien, Coventry still never rebutted Mr. Barrett's claims against them.  Therefore, on August 4, 2014 Mr. Barrett filed a UCC-1 secured transaction on Coventry in pursuant to UCC 9-102(a)(13)(A) which is a commercial tort claim against an organization.  The secured transaction (lien) was authorized by Coventry's consensual default according to the doctrine of acquiescence which is recognized by the U.S. court system ( Georgia v. South Carolina).  Coventry was given three warnings within a three month period of a possible lien if they did not rebut Mr. Barrett's claims, and thus, prove authorization of the discounts or settle.  However, Coventry neglected to defend their position in spite of the persistent warnings of receiving a lien upon their failure to do so.  Therefore, even if the lien was wrongful or unfair, according to the doctrine of "estoppel by laches" and "estoppel by acquiescence", Coventry gave up their right to seek injunctive relief or damages whether that request for relief comes from Coventry's own counsel or another party's counsel like Plaintiff, MultiPlan's.

47. Plaintiff, MultiPlan is guilty of willful misrepresentation, fraud, wire fraud, false pretenses and cheats, conspiracy, civil conspiracy, wire fraud, unjust enrichment, RICO violations and breach of contract.

48. Plaintiff, MultiPlan unilaterally enrolled Defendant into a workers' compensation network without Defendant's consent and without contractual right to do so.  They could only do this by falsifying my consent which is knowing and willful misrepresentation and fraud.

49. Plaintiff, MultiPlan profited by selling access to the falsified workers' compensation repricing agreement, and, to parties that do have right to Defendant's PHCS Agreement.

50. The discounts that Plaintiff, MultiPlan sold on Defendant's workers' compensation claims were exorbitant and Defendant did not receive any benefits in return, thereby, resulting in Defendant's severe financial harm. None of the patients were directed to Defendant as Plaintiff, MultiPlan claims. All of the discounts were taken after services were provided by Defendant to the patients. Furthermore, the patients were directed to Defendant by their attending physician as according to the Mississippi Workers' Compensation Rules and Guidelines.

51. According to Section 4.5 of the Agreement, it states that PHCS will require each Payor to make available and promote Contracts which provide Direction to Preferred Providers. A workers' compensation contract cannot provide direction because the contract is between insurance companies and employers where the insurance will pay 100% of the medical services. Therefore, the contracts are not with the individual patients and cover 100% of the medical expenses, and so do not have any financial mechanism (like savings) to direct patients to providers within a network.

52. Section 4.2 of the Agreement states that PHCS agrees that it has entered into agreements with Payors for the use of the PHCS provider network ("Payor Acknowledgement"). Each Payor Acknowledgement between PHCS and Payor will obligate the Payor to pay or arrange to pay for Covered Care rendered to Covered Individuals in accordance with the provisions of Article VII of the Agreement.

53. In Article VII of the Agreement in section 7.3, it states that for Covered Care, Participating Professional will bill or collect from a Covered Individual all co-payments, as specified in the Covered Individual's Contract. For one, workers' compensation contracts are NOT Covered Individual Contracts. They are contracts between an employer and an insurance company to cover individuals when an individual has a work related injury.

54. Consequently, co-payments cannot be collected from any Covered Individual with a workers' compensation claim, and thus, a workers' compensation network is in breach of section 4.2 of the Agreement.

55. Also, Section 4.2 of the Agreement obligates the Payor to pay or arrange to pay for Covered Care. In this case, Plaintiff, MultiPlan misrepresented their client Coventry as their payer-client with right to my PHCS Agreement. However, Coventry did not pay or

arrange to pay for Covered Care in this matter, nor are they liable to pay. Coventry is acting as a silent PPO in this matter, therefore, is not a "Payor" as according to the Agreement in section 4.2 and 1.5 that defines the payor as an organization liable to pay or arrange to pay.

56. By providing Coventry with access to Defendant's PHCS Agreement, Plaintiff, MultiPlan breached the contract by providing Defendant's proprietary fee rates to a party who is not a payor and cannot fulfill the contractual obligations to create steerage. Plaintiff, MultiPlan later falsely represented Coventry as their payer-client according to terms of the Agreement in order to justify Coventry's unlawful access to my PHCS Agreement.

57. Plaintiff, MultiPlan's law suit against Defendants is for the sole purpose of protecting their client Coventry from any legal ramifications arising from the fraudulent discounts and unlawful act of giving Coventry access to Defendant's Agreement.

58. The Mississippi Workers' Compensation Rules and Guidelines for Billing and Reimbursement clearly state that no party is obligated to a repricing agreement of any kind whatsoever. Furthermore, it states that if there is a separate fee agreement between parties, it shall be considered to include all the rules and guidelines including the fact that no party is obligated to a repricing agreement of any kind whatsoever.

59. Therefore, Plaintiff, MultiPlan's concocted workers' compensation agreement with Defendant, according to *Mississippi Law*, includes the rules that Defendant is not obligated to the re-pricing agreement.

60. Plaintiff, MultiPlan, Coventry and all other parties have persistently been informed of these facts, along with Defendant's refusing to agree to the concocted workers' compensation repricing agreement, but in defiance to the Mississippi Law, all parties have persistently refused to rescind the discounts.

61. Coventry, and all the parties, refused to rescind the discounts even with their informed knowledge of the Mississippi Law making the discounts unlawful because of Plaintiff, MultiPlan's confirmation to all the parties that the discounts have Defendant's authorization.

62. Upon information and belief, when insurance payers or other parties receive a dispute arising from an unauthorized discount, they forward the dispute to the party who provided the discount and the dispute goes on up the line to the actual PPO or silent PPO who provided the discount. The PPO or silent PPO will then attempt convince,

coerce and even intimidate and/or force the disputer into accepting the discount. After that, the dispute goes away. Therefore, the insurance payers and other parties are used to the dispute going away so they don't have to reimburse the discount.

63. This is most likely the case in this matter as Plaintiff was informed of the Mississippi Law rendering the discounts unlawful, but still refused to rescind, and reimburse the discounts, because Plaintiff, MultiPlan was falsely confirming the discounts to be authorized by Defendant.

64. Plaintiff, MultiPlan, Coventry, and each party involved in this matter was informed by Mr. Barrett that my PHCS Agreement fee rates are proprietary and only for payers as "Payers" is defined in the Agreement as the organization liable to pay or arrange to pay for services to Covered Individuals through a PHCS network. Therefore, since Coventry who accessed Defendant's Agreement was not a payer per terms of the Agreement, they did not have right to Defendant's PHCS proprietary rates even if there was a workers' comp repricing agreement in Defendant's PHCS Agreement. And so, every party down the line from Coventry did not have right to Defendant's PHCS proprietary fee rates.

65. According to Defendant's Agreement in section 1.5, a payer is an organization liable to pay or arrange to pay for health care services to Covered Individuals through a PHCS provider network. Plaintiff, MultiPlan's workers' compensation network is not a PHCS network, therefore, all the insurance payers are not a "payer" as per terms of Defendant's Agreement and did not have right to Defendant's discounts.

66. Coventry who is the party that accessed Defendant's PHCS agreement through Plaintiff, MultiPlan is not a payer of a health plan at all and does not fit the terms of the Agreement, therefore, does not have right to Defendant's PHCS Agreement and Plaintiff, MultiPlan breached Defendant's contract by providing Coventry with access to the Agreement.

67. Plaintiff, MultiPlan unilaterally enrolled Defendant into their workers' compensation plan without Defendant's consent and without contractual right to do so. They did this for the sole purpose of profiting from selling discounts on Defendant's workers' compensation claims and without any consideration of returned benefits resulting in Defendant's severe financial harm.

68. It was only after the disputes arose from Defendants did Plaintiff, MultiPlan then examined Defendant's PHCS Agreement to find ways to misrepresent language in the Agreement in order to justify Plaintiff's fraudulent acts.

69. Plaintiff, MultiPlan's misrepresentations is proof of their brazen knowing and willful intent to defraud not only the Defendant, but the Court as well.

70. Plaintiff, MultiPlan made misrepresentations to Defendants merely to have an excuse to not rescind the discounts.

71. Plaintiff, MultiPlan's misrepresentations to the court are for the purpose of protecting their client Coventry from any legal damages that Coventry may suffer as a result of their participation in this fraud (silent PPO scheme).

72. The Affidavit of Kelly Basel admitted in Plaintiff's, MultiPlan's complaint against Defendant, states Coventry is 50% of their business revenue. In Coventry's contract with Plaintiff, MultiPlan, Coventry can opt out of the contract any time that Plaintiff, MultiPlan cannot resolve a dispute over discounts provided to Coventry. This is because it would mean that their failure to do so could result in Coventry facing action and/or legal consequences for their part in the fraud, as is in this case.

73. Plaintiff, MultiPlan is suing Mr. Barrett and Defendant for the sole purpose of protecting their client, Coventry. Mr. Barrett did not file any lien against Plaintiff, MultiPlan, it was against Coventry instead. Plaintiff, MultiPlan must protect Coventry from any action arising from the fraudulent discounts provided by Plaintiff, MultiPlan.

74. In the Affidavit of Kelly Basel, Plaintiff, MultiPlan admits that their contracts with their clients include clauses where their clients can opt out of the contract if Plaintiff, MultiPlan cannot dissolve disputes arising from their discounts.

75. The discounts Plaintiff, MultiPlan provided are fraudulent, and/or not allowed to be provided to Plaintiff, MultiPlan's clients as is in this case. Consequently, Plaintiff, MultiPlan's clients can, and do, face legal consequences arising from Plaintiff, MultiPlan's discounts.

76. In order for Plaintiff, MultiPlan to keep their clients, they have to shield them from any action, or legal consequences arising from their unauthorized discounts.

77. In the Affidavit of Kelly Basel, Plaintiff, MultiPlan admits in their complaint, there is a lot of competition in this field. Therefore, for an organization like Plaintiff, MultiPlan to have an edge over the competition, they have to have the least amount of rescinded discounts. As is natural in the field of silent PPO industry, rescinded discounts are

common because the discounts are unauthorized, and therefore, get disputed against all the time.

78. In order for Plaintiff, MultiPlan to have the least amount of rescinded discounts, they must do whatever it takes to make the dispute go away. As evidenced herein, and within this case, misrepresentation of facts and contract language is their arsenal of defense to keep from rescinding discounts.

79. This is why Plaintiff, MultiPlan has made so many false statements and misrepresentations to Defendant, Mr. Barrett and now this Court. Plaintiff's misrepresentations made to Defendant and Mr. Barrett was to keep from having to rescind the unauthorized discounts.

80. Since Mr. Barrett never did accept their misrepresentations, and continued to fight on Defendant's behalf, resulting in a lien being filed against Plaintiff, MultiPlan's client, Coventry, Plaintiff, MultiPlan is now making misrepresentations to the court in order to shield Coventry from action arising from Plaintiff, MultiPlan's unauthorized discounts.

81. In Plaintiff, MultiPlans effort to protect Coventry and all other clients involved in the silent PPO activities, Plaintiff, MultiPlans lawsuit is a form of harassment, and is frivolous and without merit.

82. Even if Defendant's PHCS Agreement had language in it that would allow Plaintiff, MultiPlan to add a workers' compensation repricing agreement, according to Mississippi Law, Defendant must consent to that repricing agreement. Subsequently, Defendant did not consent, and never has.

83. Mr. Barrett continued sending letters to Plaintiff, MultiPlan, Coventry, and all the other parties informing them of their unlawful acts in this fraudulent scheme and their legal responsibility in reimbursing the unauthorized discounts.

84. In Mr. Barrett's letters, he only stated facts and laws in order to support his demands for reimbursement of the unauthorized discounts. Plaintiff, MultiPlan, and possibly the other parties, are misrepresenting his letters to be harassment, however, it is just the opposite.

85. Plaintiff, MultiPlan, after falsifying Defendant's agreement to a workers' compensation repricing agreement, listed the fee amounts on its online database for it aggregated client, Coventry, to have access to those fee rates.

86. Plaintiff, MultiPlan made profit from falsifying my agreement for such repricing of my workers' compensation claims and then selling access to those falsified discounts by charging their client, Coventry, a percentage fee of the discounts.   Furthermore, Defendant did not receive any returned benefit from this as the discounts were taken after Defendant rendered the healthcare services and so patient steerage was not a factor.    There are no financial mechanisms in place in order to direct workers' compensation patients to providers.  Additionally, according to the Mississippi Worker's Compensation Rules and Guidelines, it's the attending physician who directs the patients to physical therapy.

87. Since Plaintiff, MultiPlan profited from the fraudulent discounts, and Defendant did not receive any benefits in return, that is considered unjust enrichment from Plaintiff, MultiPlan, Coventry, EMC, Strategic Comp, Mitchell and Sentry since they all profited from discounting my workers' compensation claims.

88. Plaintiff, MultiPlan, Coventry, EMC, Strategic Comp, Mitchell and Sentry Insurance all knew that they were committing silent PPO activity by applying a PPO discount to non-PPO claims, thus, it could be construed as civil conspiracy. Since they all received the discounts through online gateways and knew they were falsely applying a PPO discount to a non-PPO claim for the purpose of cost containment.

89. Plaintiff and Plaintiff's clients were informed of the discounts not having Defendant's authorization, and Plaintiff and Plaintiff's clients still refused to reimburse the discounts, therefore, Plaintiff became guilty of falsifying Defendant's authorization of the discounts to Plaintiff's clients which could be construed to be knowing and willful intent to defraud.

90. Plaintiff, MultiPlan, Coventry, Mitchell, EMC, Sentry and Strategic Comp were all practicing silent PPO activity as described herein. Due to Plaintiff's and Plaintiff's clients participation in fraudulently discounting Defendant's workers' compensation claims at exorbitant amounts, and without any returned benefits to Defendant, Defendant has been severely financially harmed.

## PRAYER FOR RELIEF

1. The Defendant requests that this Complaint be denied based on the affirmative answers listed above.

2. Defendant requests that this case be dismissed with prejudice against Plaintiff.

3. Defendant requests for reasonable attorneys fees should this case continue moving forward.

4. Defendant requests actual, compensatory, and punitive damages in an amount to be determined by the Court.

5. Defendant requests that this Court grant to him reasonable costs for any out of pocket expenses, lost time, and other costs associates with being served with Plaintiff's complaint.

6. Defendant respectfully requests that this Court sanction the Plaintiffs for filing this frivolous and harassing law suit.

**SIGNED** this the 29th day of September, 2014.

**Respectfully submitted,**

Steven W. Holland d/b/a Physical Therapy
Clinic of Gulfport
**Defendant**
101 Dogwood Drive
Gulfport, MS 39507
228-343-1833

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Answer and Counterclaim has been furnished to all parties herein by depositing the same in the United States mail, and via electronic mail.

Marlena P. Pickering, MSB# 102584
BAKER, DONELSON, BEARMAN, CALDWELL
& BERKOWITZ, P.C.
Post Office Box 14167
Jackson, MS 39236-4167
mpickering@bakerdonelson.com

STEVEN W. HOLLAND
D/B/A PHYSICAL THERAPY CLINIC
OF GULFPORT

**SIGNED** this the 29th day of September, 2014.